# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

CIVIL ACTION NUMBER: 1:22-cv-00836

DETLEV HELMIG,

     Plaintiff,

v.

BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate,
THE INSTITUTE OF ARCTIC AND ALPINE RESEARCH ("INSTAAR"),
MERRITT TURETSKY, Director of INSTAAR,
GIFFORD MILLER, Associate Director of INSTAAR,
TERRI FIEZ,  Vice Chancellor for Research and Innovation and Dean of the Institutes,
RUSSELL MOORE, Provost and Executive Vice Chancellor for Academic Affairs,
FRANCES DRAPER, Senior Strategic Advisor – Community and Government Engagement,
MELANIE MARQUEZ PARRA, Former Director of Communications and Chief Spokesperson,
STEVE HURLBERT, Director of Communications and Chief Spokesperson,
NICOLE CARLETON, Project Manager – Office of Contracts and Grants,
CHRYSTAL POCHAY, Financial and Accounting Program Manager – INSTAAR,
LINDSAY MCCANDLESS, Senior Human Resources Professional – INSTAAR,
DEBBIE CHAPMAN, Senior Audit Manager – Investigations, Internal Audit Department,
STEVE SMITH, Director of Investigations – Internal Audit Department,
SEAN MANDEL, Manager – Investigations – Internal Audit Department,
AGNESSA VARTANOVA, Associate Vice President – Internal Audit Department,
JUSTIN ARICO, Audit Senior – Internal Audit Department,
TIM DULANEY, Audit Manager – Internal Audit Department,
PATTY DURBIN, Audit Manager – Internal Audit Department,
ERIC THOMPSON, Former Senior Audit Manager – Internal Audit Department,
BRETT KELLUM, Senior Audit Manager – Internal Audit Department,
KARISA MCCULLOCH, Senior Audit Manager – Internal Audit Department,
JUSTIN SMITH, Audit Senior – Internal Audit Department,
KATHLEEN SUTHERLAND Senior Advisory – Internal Audit Department,
SARAH TUTTLE Audit Senior – Internal Audit Department, and
GREGORY BROWN, Fiscal Compliance Analyst – Campus Controller's Office.
**IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES.**

     Defendants.

1

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Detlev Helmig, through his attorneys, Jester Gibson & Moore, LLP, for his complaint against Defendants the Board of Regents of the University of Colorado, *et al*., states and alleges as follows:

## INTRODUCTION

1.      Dr. Helmig, a former associate research professor and scientist at the University of Colorado ("CU") and Institute of Arctic and Alpine Research ("INSTAAR"), brings this action for retaliation, deprivation of rights without due process, and breach of contract. In 2020, Dr. Helmig received a letter purporting to terminate his employment, in contravention of CU's established and binding policies. Dr. Helmig asked CU to acknowledge its error, reinstate him, and abide by its own governing laws. Instead, CU responded with an egregious smear campaign against Dr. Helmig, publishing half-truths and outright lies in order to destroy his reputation. The effect was to render it impossible for Dr. Helmig to obtain a comparable appointment at another institution and bring an abrupt end to his decades of critical and often ground-breaking environmental research. Based on these actions and statements, Dr. Helmig asserts claims against CU, and the persons named above, in both their individual and official capacities, for denial of his due process rights, in violation of 42 U.S.C. § 1983 and the Constitution of the United States of America. Dr. Helmig also asserts claims against CU for unlawful retaliation under the False Claims Act and under Colorado law for breach of contract, and, in the alternative, promissory estoppel.

2.      Plaintiff Detlev Helmig, Ph.D., is an internationally prominent atmospheric research scientist and a citizen of Colorado who, until the events described below, enjoyed a

sterling reputation for the quality and extent of his atmospheric and climate research.

3.      Defendant Board of Regents of the University of Colorado is a body corporate authorized to staff CU's Boulder Campus ("CU-Boulder") with teaching and research faculty.

4.      Defendant Institute of Arctic and Alpine Research ("INSTAAR") is an interdisciplinary scientific research arm and institute of CU-Boulder dedicated to understanding change in Earth systems whose work relies heavily on grant funding from the National Science Foundation.

5.      Defendant Merritt Turetsky is the current Director of INSTAAR.

6.      Defendant Gifford Miller is the current Associate Director of INSTAAR.

7.      Defendant Terri Fiez is the  Vice Chancellor for Research and Innovation and Dean of the Institutes for CU-Boulder.

8.      Defendant Russell Moore is the Provost and Executive Vice Chancellor For Academic Affairs for CU-Boulder.

9.      Defendant Frances Draper is the Senior Strategic Advisor – Community and Government Engagement for CU-Boulder.

10.     Defendant Melanie Parra is the former Director of Communications and Chief Spokesperson for CU-Boulder.

11.     Defendant Steve Hurlbert is the current Director of Communications and Chief Spokesperson for CU-Boulder.

12.     Defendant Nicole Carleton is a Project Manager in the CU-Boulder Office of Contracts and Grants.

13.     Defendant Chrystal Pochay is the Financial and Accounting Program Manager for INSTAAR.

14.     Defendant Lindsay McCandless is the Senior Human Resources Professional for INSTAAR.

15.     Defendant Gregory Brown is a Fiscal Compliance Analyst in the CU-Boulder Controller's Office.

16.     The CU-Boulder Internal Audit Department published a factually incorrect and harmful report about Dr. Helmig, in which the following Defendants had a role:

   a.  Defendant Debbie Chapman, Senior Audit Manager of Investigations.

   b.  Defendant Steve Smith, Director of Investigations.

   c.  Defendant Sean Mandel, Manager of Investigations.

   d.  Defendant Agnessa Vartanova, Associate Vice President.

   e.  Defendants Tim Dulaney and Patty Durbin, Audit Managers.

   f.  Defendants Brett Kellum and Karisa McCulloch, Senior Audit Managers.

   g.  Defendant Eric Thompson, former Senior Audit Manager.

   h.  Defendants Justin Smith, Justin Arico, and Sarah Tuttle, Audit Seniors.

   i.  Defendant Kathleen Sutherland, Senior Advisory.

**JURISDICTION AND VENUE**

17.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1367.

18.     Dr. Helmig asserts legal claims for the utterance of a false statement sufficiently derogatory to injure his reputation and a state-imposed alteration of his protected liberty and property interests in employment, in violation of the Due Process rights afforded to him by the

Fifth and Fourteenth Amendments to the United States Constitution.

19.     Dr. Helmig asserts legal claims under the False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.*, for the retaliation he suffered, including his wrongful termination from employment, for opposing INSTAAR and CU's practice of overbilling the federal government.

20.     Dr. Helmig also asserts claims under Colorado state law that are so related to his Due Process claims that they form part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

21.     Venue is proper in this court, because all the acts or omissions giving rise to Dr. Helmig's claims occurred in the District of Colorado. 28 U.S.C. § 1391(b)(2).

## FACTS

### A.  Dr. Helmig's Work as a Research Scientist

22.     After receiving his university education and Ph.D. in Germany, Dr. Helmig moved to the United States to continue his research and study of atmospheric science as a postdoctoral scientist at the University of California-Riverside.

23.     Dr. Helmig joined CU in 1995, from which he based his career for the next 25 years.

24.     Until CU purported to terminate Dr. Helmig's employment, he had continuously held the position of Associate Research Professor for more than 15 years.

25.     In that time Dr. Helmig conducted approximately 90 research projects through his role at CU, bringing approximately $31,000,000 in research funding to the institution.

26.     Dr. Helmig secured funding sufficient to cover: his entire salary, for the entire duration of his tenure; 53 years' of graduate student stipends; 18 years' of postdoctoral scientist support; 16 years of research staff; and 13 years' of undergraduate support.

27.     The majority of funding for Dr. Helmig's work was granted by the National Science

Foundation ("NSF"), an agency of the United States government that funds scientific research at colleges and universities.

28.     While representing CU, Dr. Helmig published approximately 200 peer-reviewed publications, including, on multiple occasions, in the world's most prestigious scientific journal, *Nature*.

29.     At CU's request, but without any institutional support standard to the position, Dr. Helmig also served as Domain Editor-in-Chief of the non-profit, open access environmental science journal *Elementa*, published by the University of California Press. The journal has risen to be one of the most prominent geoscience journals published in the United States.

30.     Dr. Helmig has served on a plethora of national and international committees, representing CU, including the Global Atmospheric Watch program and the Intergovernmental Panel for Climate Change.

31.     Dr. Helmig was the primary advisor of ten of CU's successful Ph.D. students, ten graduate students, and 41 undergraduate students. He also regularly served as a mentor in the training courses of scientists from developing countries.

32.     Prior to the events giving rise to this suit, Dr. Helmig had an equally prestigious reputation within CU. In the 10 years preceding his termination, every performance evaluation rated Dr. Helmig at the highest (Highly Exceeds Expectations) or second highest (Exceeds Expectations) ranking. Not one evaluation remotely mentioned any of the allegations that CU would later use to besmirch him.

33.     Dr. Helmig's research was also fundamental to proving the harms caused by increased fracking activity, globally and throughout the state of Colorado. Since 2019,

Dr. Helmig's research has been relied on to advance legislation to better protect Coloradans.

34.    The oil and gas industry was a vocal opponent of Dr. Helmig's work and attacked him personally in a variety of attempts to discredit him.

**B.  CU Engaged in Increasingly Questionable Billing Practices**

35.    CU adds substantial fees for overhead costs to every grant applied for by faculty. The fees are added in an amount equal to 54% of all direct costs for "on-campus" projects and 26% for "off-campus" projects, as CU defines those terms.

36.    The "on-campus" rate applies by default, and unless and until the researcher can establish that 50% or more of the work will occur "off-campus," within the parameters set by CU.

37.    Over time, CU has progressively whittled down the definition of "off-campus" beyond recognition. For example: CU now defines conference travel as an "on-campus" cost, and home offices or field work locations are typically deemed "on-campus," despite the obvious contradiction.

38.    Exemplary of this distortion, a 2-month salary expenditure grant—funding 31 days of field research and a mere 8 days on-campus—would be deemed an "on-campus" project.

39.    CU arrives at this absurd conclusion by treating the researcher's non-work time (weekends and vacation time) as "on-campus" costs.

40.    On all projects, INSTAAR adds an additional 6% administrative fee, on the theory that INSTAAR performs a share of administrative work (that CU has already charged for), which raises the combined administrative fees for supposedly "on campus" projects to 60%.

41.    Moreover, CU classifies the INSTAAR administrative fee as another "on-campus" cost, making it all the more difficult for INSTAAR projects to qualify for the "off-campus" rate.

Combined with CU's aggressive efforts to characterize every possible charge as "on-campus," the effect has been that in recent years CU has charged a combined 60% in overhead fees for virtually all INSTAAR projects, even those which, by any fair standard, have been primarily off-campus projects.

### C. Dr. Helmig Repeatedly Opposed CU's Overbilling Practices and CU Retaliated Against Him

42.     Throughout the years, Dr. Helmig repeatedly challenged the duplicative and unjustified application of the INSTAAR overhead fees on top of CU overhead fees.

43.     He questioned the practice of charging both INSTAAR's 6% fee and the portion of CU's overhead fees allocated to compensate the same administrative services; believing that CU needed to re-allocate funds within its own institution, not charge those fees twice.

44.     Dr. Helmig also repeatedly voiced opposition to CU's aggressive practices in characterizing clearly off-campus expenses and the INSTAAR administrative fee as "on-campus" costs. INSTAAR's fee was often the deciding factor in applying the "on-campus" overhead rate, rather than the "off-campus" overhead rate.

45.     Dr. Helmig expressed that applying the "on-campus" rate to research projects that were predominantly taking place off-campus was a dishonest mechanism to secure a windfall payment from government funding sources, such as the NSF.

46.     Dr. Helmig expressed his opposition to these practices repeatedly to Chrystal Pochay, INSTAAR's Financial and Accounting Program Manager, and also raised the issue to the INSTAAR Director and Directorate.

47.     Ms. Pochay disdained Dr. Helmig's opposition to this fraudulent fee charging

scheme, and instituted a campaign of retaliation against him, which ultimately resulted in his termination.

48.    Increasingly over time, Ms. Pochay systematically blocked Dr. Helmig's research.

49.    By early 2019, Ms. Pochay's hostility had grown to such a point that Dr. Helmig requested the intervention of Dr. Gifford Miller, INSTAAR's  then-Acting Director.

50.    CU took no action to address the harassment and retaliation by Ms. Pochay, in violation of its own policies.

51.    Ms. Pochay filed such baseless "reports" that, on multiple occasions, Pamela Rosse, then-Director of CU-Boulder's Office of Compliance, Conflicts of Interest, and Commitment[1] had to remind her that Dr. Helmig's work was permissible and perfectly ordinary.

52.    Unsatisfied with this response, and in retaliation for Dr. Helmig's opposition to INSTAAR improperly adding inflated overhead fees to government grants, Ms. Pochay took it upon herself to impede Dr. Helmig in any way possible, including preventing him from buying key equipment and materials.

53.    For example, Ms. Pochay refused to approve Dr. Helmig's purchase of calibration standards, necessary to perform his research.

54.    Ms. Pochay directed Dr. Helmig to find another vendor, despite being told several times over that there is only *one* vendor for this highly specialized information.

55.    Multiple INSTAAR employees were forced into the issue, including Dr. Miller and Lindsay McCandless, INSTAAR's Senior HR Professional.

---

[1] Later renamed the Conflicts of Interest and Commitment department.

56.     Frustrated and unable to complete his work without the standards, Dr. Helmig suggested that Boulder A.I.R. could make the purchase and later be reimbursed. Ms. McCandless agreed that could be a possible resolution.

57.     Rather than do her job and work to resolve the situation, Ms. Pochay made another baseless report about Dr. Helmig's suggestion, this time to Greg Brown, Fiscal Compliance Analyst in CU-Boulder's Campus Controller's Office.

58.     Mr. Brown informed Ms. Pochay that he was not the appropriate receiver for her complaint, and directed her to discuss any concerns with Dr. Miller.

59.     Throughout this time and after Dr. Helmig's termination, Ms. Pochay went well beyond the scope of her job duties and authority, tracking and "reporting" on Dr. Helmig's work, which was fully disclosed to and authorized by CU.

### D.  Certain Governmental Entities Refused to Contract Directly With CU, Leading to the Formation of Boulder A.I.R., With Full Disclosure to CU

60.     CU's excessive overhead fees greatly increase the cost to government entities funding research by INSTAAR researchers, whether by grant or contract.

61.     For example: A research scientist who applies for a grant to fund a research project that will have $100,000 of direct costs must be awarded a grant of $160,000 to pay CU's exorbitant overheard costs. It also means that in order to contract with CU, another entity must agree to pay it $160,000 for $100,000 worth of work.

62.     Other CU research departments do not charge a secondary administrative fee, on top of CU's fees; this makes INSTAAR projects among the most expensive to fund, even setting aside excessive use of the on-campus rate.

63.     For several years, Dr. Helmig had secured for CU a contract with Germany's equivalent to the Environmental Protection Agency, for air monitoring and related work.

64.     Through the end of 2017, CU properly charged the off-campus rate for administrative charges on this contract. However, when the contract was up for renewal at the end of 2017, CU determined that the same work which previously was deemed "off-campus" and subject to 32% in administrative fees, would henceforth be deemed "on-campus" and subject to 60% in administrative fees.

65.     Unsurprisingly, the German agency declined to renew its contract with CU following this dramatic and arbitrary increase in cost.

66.     Not coincidentally, this was the first renewal of the German agency contract after Ms. Pochay took over her current role.

67.     The German government sought alternative options to continue the important work, ultimately leading Dr. Helmig to found Boulder Atmosphere Innovation Research LLC ("Boulder A.I.R.")

68.     Before forming Boulder A.I.R., Dr. Helmig discussed his plan with Ms. Rosse, Director for Compliance, Conflicts of Interest, and Commitment.

69.     Dr. Helmig advised his then-director, Dr. Alan Townsend, of the formation of Boulder A.I.R. and then submitted an Application for Approval of Regular and Periodic Consulting Activities, on February 14, 2018.

70.     On April 4, 2018, Dr. Townsend and Vice Chancellor Fiez approved Dr. Helmig's application, acknowledging that he would be working with Boulder A.I.R. through 2021.

71.     Dr. Gifford Miller, then-Interim INSTAAR Director, also signed a Conflict of

Interest Memorandum of Understanding, on May 31, 2018, acknowledging Dr. Helmig's work with Boulder A.I.R.

72.     On or about February 9, 2019, Jason Elkins, on behalf of the City of Longmont, contacted Dr. Helmig to contract for air quality studies. Mr. Elkins specified that, in order for Longmont to contract with CU for the work, they likely would have to go through the time-consuming process of establishing an Intergovernmental Agreement.

73.     Even so, Dr. Helmig pushed for Longmont to contract directly with CU, and worked with Mr. Elkins and the CU administration to move that process forward.

74.     On February 13, 2019, Mr. Elkins wrote to Dr. Helmig: "I need you to provide me with a quote for services through your company and not CU. In order to expedite this, it's much easier to contract with your company than CU."

75.     Dr. Helmig immediately contacted the CU-Boulder Office of Contracts & Grants, alerting CU to Longmont's request to contract with Boulder A.I.R. rather than CU and expressed that he needed CU's input to secure the contract *for the university* emphasizing the time-sensitive nature of Longmont's request.

76.     On behalf of that office, David Christopher, senior contracts officer, responded that he wanted the advice of Nicole Carleton, project manager, before responding to Longmont, but Ms. Carleton was out of the office that week.

77.     Dr. Helmig followed up with Ms. Carleton on February 18, 2019, the first day she was scheduled to return.

78.     The next day, February 19, 2019, Ms. Carleton wrote back, asking Dr. Helmig to assist in the price quote for the requested services. Dr. Helmig responded in less than 90 minutes,

with the pricing information, and, again, impressing the timing issue, writing: "There is an upcoming City Council meeting in the first week of March where these quotes will be presented and voted on."

79.     On February 20, 2019, Mr. Elkins wrote to Dr. Helmig: "we need the proposal by the end of today[.]" Dr. Helmig alerted Ms. Carleton that Longmont needed the proposal that day and asked if that was possible. Ms. Carleton did not respond.

80.     Shortly after 5 p.m., Dr. Helmig informed Mr. Elkins that CU had not yet given its final approval of the proposal, but still Dr. Helmig touted the benefits of contracting directly through CU.

81.     CU's failure to deliver a timely proposal led Mr. Elkins to write: "What about the proposal from Boulder AIR? We aren't going through the University."

82.     Fully 24 hours after that exchange, and after the opportunity had been lost, Ms. Carleton finally responded with "advice" on revisions to the proposal. By that point, Longmont had already decided it would not contract with CU.

## E.  Defendants Terminated Dr. Helmig's Employment, Willfully Violating the Law in the Process

83.     Eventually, Ms. Pochay's retaliatory and unfounded allegations against Dr. Helmig gained traction, when Mr. Brown tasked Debbie Chapman, Senior Audit Manager of Investigations, with looking into them.

84.     Ms. Chapman spoke with Ms. Pochay, who repeated her litany of false and misleading allegations. This prompted Ms. Chapman to initiate an internal audit of Dr. Helmig.

85.     In conducting their internal "audit," Eric Thompson had a superficial and

perfunctory conversation with Dr. Helmig, but the Defendants did not otherwise ask Dr. Helmig for any information concerning specific activities or the reasons for them.

86.     On April 7, 2020, Drs. Merritt Turetsky and Miller delivered a purported "Notice of Termination" to Dr. Helmig, signed by Dr. Turetsky and Terri Fiez in their respective capacities as Director of INSTAAR and Vice Chancellor for Research & Innovation.

87.     The Notice of Termination alleged that Dr. Helmig was being terminated on grounds which Defendants knew, at the time, were demonstrably false:

      a.   His outside personal and financial interests had negatively impacted his personal judgment and compromised his professional "loyalty" to CU;

      b.   He was not fully cooperative nor transparent with CU officials about his work for Boulder A.I.R.; and

      c.   He intentionally diverted CU resources (including contract opportunities).

88.     Not only were these untrue, but the Defendants went on to wildly overexaggerate these claims, purposefully damaging Dr. Helmig's reputation.

89.     Moreover, the Notice of Termination failed to meet *any* of the necessary prerequisites to terminate a faculty member in Dr. Helmig's position.

90.     For decades, Colorado has been clear: CU's adopted policies and the Laws of the Regents of the University of Colorado ("Regent Laws") dictate the terms of faculty appointments when they provide job protections. "Where the regents have promulgated rules governing such matters as termination of appointees and such rules are more stringent in favor of the appointee, then due process requires that the regents strictly comply with their rules." *Subryan v. Regents of University of Colorado*, 698 P.2d 1383 (Colo. App. 1984); *accord. Churchill v. Univ. of Colorado*

*at Boulder,* 2012 CO 54, 285 P.3d 986.[2]

91.    Throughout Dr. Helmig's employment, CU's formally adopted and published policies provided that associate research professors hold multi-year term appointments. As of the time of CU's termination of Dr. Helmig, he held a five-year appointment under these policies.

92.    Applicable Regent Laws designated all faculty appointments for a specified term of years as a "limited appointment." Regent Laws, art. 5.B.2(B)(2).

93.    Regent Laws strictly regulated the dismissal of all faculty on term appointments, providing that:

    a.  Revocation of the appointment during the term constitutes a "dismissal." *Id*. at art. 5.C.2(A)(2), (3).

    b.  Authority to dismiss faculty is reserved to the Board of Regents. *Id.* at art. 5.C.1.

    c.  Faculty may be dismissed only following determinations by the Regents that (i) a specifically enumerated ground for dismissal was present, and (ii) the best interests of CU required dismissal. *Id.*;

---

[2] *Churchill,* 285 P.3d at 992 fn. 1:

> The Constitution charges the Regents with "the general supervision of [the University of Colorado] and the exclusive control and direction of all funds of and appropriations to [the University]." Colo. Const. art. VIII, § 5. The General Assembly has further clarified these supervisory duties to include the hiring and firing of professors. § 23–20–112(1), C.R.S. (2011) ("The board of regents shall enact laws for the government of the university; appoint the requisite number of professors, tutors, and all other officers; and determine the salaries of such officers.... It shall remove any officer connected with the university when in its judgment the good of the institution requires it."). Pursuant to this constitutional and statutory authority, the Regents have adopted the "Laws of the Regents" as the University's primary governing document.

d.  The permitted causes for dismissal are limited to "demonstrable professional incompetence, gross or repeated neglect of duties, conviction of a felony, sexual harassment, or other conduct that falls below minimum standards of professional integrity." *Id*. at art. 5.C.1.

e.  "A faculty member whose dismissal for cause is contemplated shall be given written notification as far in advance as possible of the contemplated effective date of dismissal for cause and the reasons therefor. Such notice shall inform the faculty member of the right of review as provided in this subsection." *Id*. at art. 5.C.1(B).

f.  The referenced "right of review" includes the right to a pre-termination hearing before the "Privilege and Tenure Committee". *Id*.

94.  Not one of the foregoing substantive or procedural prerequisites was met by CU with respect to its termination of Dr. Helmig. Even when Dr. Helmig asked what appeals or grievances were available to him, he was expressly, and incorrectly, told that he had no such recourse.

95.  In contravention of each of the foregoing Regent Laws, Drs. Turetsky and Fiez's Notice of Termination:

a.  Gave no indication that the dismissal of Dr. Helmig had been approved by any higher authority within CU, let alone its Board of Regents;

b.  Gave Dr. Helmig no advance notice of termination, but rather purported to be effective that day;

c.  Failed to identify any of the allowed grounds for dismissal identified in the Regent Laws;

    d.    Was issued without having afforded Dr. Helmig any prior opportunity to be heard; and

    e.    Failed to inform Dr. Helmig of his rights to a hearing before the Privilege and Tenure Committee.

96.    As grounds for denying Dr. Helmig any of his rights as a faculty member with a limited appointment, the Notice of Termination wrongly claimed that Dr. Helmig was an "at-will" employee, "pursuant to C.R.S. § 24-19-104."

97.    Dr. Helmig vigorously disputed that any cause existed for his dismissal, or that he engaged in any misconduct whatsoever, and demanded that if CU still wished to dismiss him, it issue him a proper notice of intent to dismiss and honor his right to a hearing before the Privilege and Tenure Committee before such dismissal could take effect.

98.    Defendants refused to comply with the law, in willful violation of Dr. Helmig's clearly established contractual and due process rights.

99.    Defendants proceeded with the improper and illegal termination of Dr. Helmig's employment.

100.    Going much farther, CU then launched an outrageous smear campaign against Dr. Helmig, in a sloppy attempt to divert attention from its wrongdoing.

**F.  The Defendants Lied to the Public to Vilify Dr. Helmig**

101.    On April 15, 2020, Boulder County Commissioner Elise Jones contacted Philip DiStefano, CU-Boulder Chancellor, regarding Dr. Helmig's termination.

102.    Chancellor DiStefano asked Defendant Russell Moore, Provost and Executive Vice Chancellor for Academic Affairs, to provide information.

103.    Without citing any supporting evidence, Mr. Moore wrote that Dr. Helmig "violated university policy regarding conflicts of interest and the Employee Fiscal Code of Ethics. Helmig diverted university opportunities to his private company in violation of university policy and an agreement that he signed in August, 2019. Moreover, he was not transparent regarding his work with that private company."

104.    None of that was true. In fact:

a.  Dr. Helmig did not violate CU policies or codes;

b.  He sought to direct business opportunities to CU, even when municipal governments expressed a strong preference for not contracting with CU; and

c.  He proactively disclosed to CU his work through his private company and worked diligently to comply with the byzantine red tape imposed by CU to perform work through it.

105.    On April 16, 2020, Defendant Frances Draper, Senior Strategic Advisor – Community and Government Engagement, sent a response to Commissioner Jones.

106.    Mr. Moore had cautioned that the response "goes a bit beyond our normal 'this is a personnel matter' approach…"

107.    In the publicly accessible letter, Ms. Draper wrote: "The university determined, after careful review and consideration, that the separation of work and resources was not being maintained and a separation of the university from Dr. Helmig and his commercial enterprise was required."

108.    This was also untrue: there was no failure by Dr. Helmig to maintain the "separation of work and resources," nor did CU engage in any "careful review and consideration."

109.     Without any apparent sense of irony, Ms. Draper noted that "personnel matters are confidential," and, one sentence later, invited Commissioner Jones to "feel free to share this letter[.]"

110.     This came to characterize CU's approach: the public sharing of false statements regarding personnel matters, calculated to disparage Dr. Helmig.

111.     In fact, the next day, Western Wire, an oil and gas industry publication, reported that CU Interim Director of Communications and Chief Spokesperson Melanie Marquez Parra stated that Dr. Helmig "failed to maintain the required degree of daylight between publicly funded research efforts and his own for-profit business."

112.     Among other allegations, Ms. Parra suggested there was some impropriety in the fact that "Dr. Helmig created a private enterprise, Boulder A.I.R., an LLC which performs work substantially similar to that performed by Dr. Helmig for the university."

113.     Ms. Parra omitted that CU had expressly consented to Dr. Helmig's working through Boulder A.I.R., and in fact *celebrated* its founding, an omission which made her public statement highly misleading.

114.     Ms. Parra went on to repeat the same misleading statement at least twice more, to Katie Langford, Boulder Daily Camera staff writer, and in response to a media request from Rebecca Trager, Royal Society of Chemistry.

115.     Notably, Ms. Parra seems to have let the façade slip momentarily, in that early conversation with Western Wire, which reported: "In order *to avoid any interpretation of misuse* of university resources, Parra continued, Helmig's departure was necessary." If CU had actually

found any misuse, as it claimed repeatedly, there would be no possibility or concern of *interpreting* its existence.

116.    CU's statements sparked a firestorm of disparaging articles from oil and gas industry publications, including Western Wire, who had long been critical of Dr. Helmig's work evidencing the harms the industry causes to people and the environment.

117.    Before the end of the month, Sue Posner, Executive Assistant to INSTAAR Director, set up a meeting between Dr. Turetsky, Dr. Miller, and key decision makers at NSF, "regarding Helmig NSF grants."

118.    Drs. Turetsky and Miller repeated to the NSF these same false and misleading statements concerning Dr. Helmig, further sullying his reputation with the very entity he relied on to fund most of his research.

119.    Although the NSF ultimately did not find that Dr. Helmig had engaged in any misconduct and took no action against him, it took over a year before the NSF could close the matter, largely because of CU's delays in providing it with information.

### G.  CU Published a Sham Investigation Condemning Dr. Helmig and Aimed at Exiling Dr. Helmig From Academia

120.    Although CU's initial public statements caused massive damage to Dr. Helmig's reputation through widespread negative press, a number of environmental groups, and at least one member of Colorado's General Assembly, publicly questioned CU's claims and stated reasons for terminating Dr. Helmig. In addition, Dr. Helmig asserted that his termination was unlawful and demanded that CU either outright rescind it, or at least afford him the procedural rights he was guaranteed by Regent Laws.

121.    In a misguided attempt to insulate itself after terminating Dr. Helmig, CU commissioned an Investigation Report and Internal Audit ("Investigation Report") with the primary purpose of conjuring reasons to justify Dr. Helmig's termination.

122.    Dr. Helmig was not given any opportunity to respond to or present evidence before the Investigation Report was distributed publicly, to the media.

123.    The Investigation Report is characterized by overwhelming factual inaccuracies and contradictions to the investigators' own notes.

124.    The Investigation Report raised a new set of contrived and damaging allegations against Dr. Helmig, different from those in the Notice of Termination: "improper spending and usage of Fund 29 and 78 accounts, improprieties with sponsored research projects, effort reporting, conflicts of interest, property usage, and personnel issues[.]"

125.    The Investigation Report baselessly concluded that:

> [T]he actions of Detlev Helmig, as they relate to diverting funds to a private enterprise Boulder Atmospheric Innovation Research LLC (Boulder AIR) that otherwise could be available to the university, the misuse of university property for personal gain, and the improper handling or reporting of financial transactions, constitute violations of [University] policies including fiscal misconduct.

126.    The Investigation Report is replete with falsehoods and intentionally misleading statements.

    a.  For example, the Investigation Report states: "Specifically, the work efforts for each employee on each project were not accurately reported to NSF."

    b.  In reality, the underlying investigation made no finding of wrongdoing. The unpublished investigation notes clarified that a variance was observed, but the

investigator "did not investigate why these variances occurred, he only noted when they did occur."

127.   The investigation team did not even contact Dr. Helmig to inquire about the variance; if they had, they would have learned that Dr. Helmig and INSTAAR staff identified one inconsistency between travel and payroll records, in 2017, which was immediately corrected.

128.   Similarly, the Investigation Report claims that certain reports did not accurately represent the actual time spent of the project worked on.

129.   In reality: over 25 years of service as a group lead, and with an average of 5-6 employees at a time, Dr. Helmig filed on the order of 1,800 monthly employee salary allocations, most commonly with parts of each salary paid from multiple different research grants. In total, Dr. Helmig filed approximately 5,000 different salary allocations.

130.   Of 5,000 salary allocations, across 25 years, the Investigation Report alleges that *2* entries contained inaccuracies.

131.   Equally dubious, the Investigation Report accused Dr. Helmig of carrying too high of a balance in his Auxiliary Renewal & Replace fund.

132.   In reality: again, the truth was buried within the investigator's unpublished notes, which expressly noted that although it is unusual to find such a large balance in an auxiliary account, "it is not against the rules."

133.   None of the findings above merited discipline, let alone summary termination, and in each instance the Investigation Report either outright misstated or greatly exaggerated the investigator's actual finding.

134.   The Investigation Report also reiterated the original allegation that Dr. Helmig

diverted contracts from CU to his own company, Boulder A.I.R., specifically with respect to the air monitoring contract with the City of Longmont. The Investigation Report bolstered this report with a damning quote attributed to a City of Longmont official.

135.    This portion of the Investigation Report is pure fabrication. A City of Longmont official categorically denied and directly contradicted that anyone in his office gave the alleged quote contained in the Investigation Report. Contemporaneous e-mails confirm that the purported quote in the Investigation Report is an outright invention.

136.    The notion that this project was ever "the University's contract," as stated in the Investigation Report is preposterous.

137.    The City official also expressed serious concerns about the investigation, requesting copies of the photographs investigators took, potentially while trespassing onto City property, representing a "security breach" that would need to be addressed.

138.    The Investigation Report states, "The university discovered that their contract with the City of Longmont had been switched from CU Boulder to INSTAAR when Mr. Helmig asked if he could rent equipment from the university in order for Boulder AIR to do work for the city of Longmont."

139.    This is a lie, impugning Dr. Helmig's reputation by characterizing him as concealing pertinent information regarding the Longmont contract.

140.    CU's contention is wholly disproved by series of emails between Dr. Helmig, Mr. Elkins at the City of Longmont, and numerous CU officials (among them, Ms. Carleton, Mr. Christopher, Dr. Miller, and Ms. Rosse).

141.    In yet another blatant lie, the Investigation Report alleges that Dr. Helmig engaged

in "fiscal misconduct" by entering into a contract on behalf of Boulder A.I.R. with Boulder County.

142.    Boulder A.I.R. had no such contract: *CU did*.

143.    For the Investigation Report to contain the statements, as it does, investigators would have had to willfully ignore or intentionally seek to mislead the Regents, and the public.

144.    The real purpose of the Investigation Report was made clear, when CU published the shoddy document *directly to the media*.

145.    The Investigation Report continues on in the same fashion, alleging all sorts of misconduct that, if true, would lock Dr. Helmig out of any future academic opportunities; allegations which are resoundingly disproven by CU's own records.

146.    Dr. Helmig was not given any opportunity to review, respond, or otherwise clear his name, before CU damaged his reputation beyond repair.

147.    The CU Internal Audit Department failed to conduct a legitimate investigation, preferring to invent a scandal that would distract from its own wrongdoing.

148.    Upon information and belief, each of the following Defendants assisted with, oversaw, contributed to, or ratified the Investigation Report: Debbie Chapman, Steve Smith, Sean Mandel, Agnessa Vartanova, Justin Arico, Tim Dulaney, Patty Durbin, Eric Thompson, Greg Brown, Brett Kellum, Karisa McCulloch, Justin Smith, Justin Arico, Kathleen Sutherland, and Sarah Tuttle.

### H.  The Aftermath

149.     CU's malicious and dishonest conduct have ruined Dr. Helmig's career, and in many ways, his life.

150.    Before CU incinerated Dr. Helmig's reputation to save itself from embarrassment,

he was a widely respected researcher, heavily in demand to give lectures and collaborate on cutting edge scientific exploits, around the world.

151.    Dr. Helmig's research work spanned the globe, with varied projects, ongoing, in the Arctic, Antarctic, and many locations between.

152.    Today, he has been relegated to monitoring air quality for municipal governments within commuting distance of his home.

153.    Dr. Helmig lost access to *twenty-five years' worth* of his own research, insights, and accomplishments.

154.    Dr. Helmig lost access to the *next* twenty-five years of what was set to be a storied and deeply impactful career.

155.    CU published the false and injurious statements about Dr. Helmig to NSF, to justify its request for approval of a new Primary Investigator, so that CU could utilize the funding Dr. Helmig had secured.

156.    No academic institution of repute would associate itself with someone accused of such wrongdoing as CU lodged against Dr. Helmig.

157.    CU did all it could to devastate Dr. Helmig, professionally and personally, all to cover up a botched and unjustified attempt at terminating his employment at CU.

## **STATEMENT OF CLAIMS**

### **First Claim for Relief:**
### **Deprivation of Property Interest Without Due Process of Law**

### **(Against ALL DEFENDANTS, in their individual and official capacities)**

158.    The foregoing allegations are realleged and incorporated herein by reference.

159.    Dr. Helmig had a property interest in his continued employment.

160.    Defendants, in their individual and official capacities, as agents and on behalf of CU, terminated Dr. Helmig's employment without affording him the protections due by law.

161.    Defendants failed to provide Dr. Helmig with the opportunity to engage in the process required prior to termination.

162.    Defendants' termination of Dr. Helmig's employment caused a material alteration of his legal status or rights.

163.    As a direct result of Defendants' conduct and actions, Dr. Helmig has suffered and continues to suffer damages.

**Second Claim for Relief:**

**Deprivation of Liberty Interest Without Due Process of Law**

**(Against ALL DEFENDANTS, in their individual and official capacities)**

164.    The foregoing allegations are realleged and incorporated herein by reference.

165.    Dr. Helmig had a liberty interest in his professional reputation.

166.    Defendants, in their individual and official capacities, as agents and on behalf of CU, made false and injurious statements about Dr. Helmig in connection with the termination of his employment.

167.    Defendants made such statements knowing they would be likely to cause Dr. Helmig reputational harm.

168.    Defendants' false and injurious statements about Dr. Helmig were publicly disseminated.

169.    Defendants failed to provide Dr. Helmig with the opportunity to clear his name

prior to making the false and injurious statements.

170.    Defendants' false and injurious statements stigmatized Dr. Helmig and prevented him from obtaining subsequent employment in his career field.

171.    As a consequence, Defendants denied Dr. Helmig access to millions of dollars in research funding that he had already secured.

172.    As a direct result of Defendants' conduct and actions, Dr. Helmig has suffered and continues to suffer damages.

**Third Claim for Relief:**
**Breach of Contract**

**(Against Defendants INSTAAR and THE BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO)**

173.    The foregoing allegations are realleged and incorporated herein by reference.

174.    Dr. Helmig had a term appointment as an Associate Research Professor, under which he agreed to certain teaching and research responsibilities in exchange for compensation and certain job protections.

175.    This agreement was a contract between the parties.

176.    Pursuant to the contract, Dr. Helmig's employment with CU and INSTAAR could be terminated during the term only for certain causes specified in Regent Law and only upon affording Dr. Helmig certain procedural rights.

177.    Dr. Helmig performed his obligations under the contract by teaching, researching, and representing CU in various publishing and speaking enterprises.

178.    In or around April 2020, Defendants breached the contract with Dr. Helmig, or demonstrated a clear and definite intention not to perform under the contract, when Dr. Turetsky

and Ms. Fiez, in their respective capacities as Director of INSTAAR and Vice Chancellor for Research and Innovation, informed Dr. Helmig that his employment was being terminated, effective immediately, in an e-mail and without any due process afford to his position by law.

179.    As a direct result of Defendants' conduct and actions, Dr. Helmig has suffered and continues to suffer damages.

## Fourth Claim for Relief:
## Promissory Estoppel

**(Against Defendants INSTAAR and THE BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO; as Alternative to First Claim for Relief)**

180.    The foregoing allegations are realleged and incorporated herein by reference.

181.    The Board of Regents, on behalf of and as an agent of CU, promulgated the Regent Laws, and CU-Boulder established policies, which together govern termination of term appointments, and which promised certain substantive and due process job protections.

182.    INSTAAR, as a subdivision of CU, was bound by these decrees.

183.    The Board of Regents and INSTAAR should reasonably have expected that these promises would induce action or forbearance by Dr. Helmig.

184.    Dr. Helmig detrimentally relied on these promises by refraining from seeking appointment with any other research institution.

185.    Defendants have refused to honor their promises to Dr. Helmig.

186.    Defendants' promises to Dr. Helmig must be enforced to prevent injustice.

187.    As a direct result of Defendants' conduct and actions, Dr. Helmig has suffered and continues to suffer damages.

**Fifth Claim for Relief:**

**False Claims Act Retaliation**

**(Against Defendants INSTAAR and THE BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO)**

188.   The foregoing allegations are realleged and incorporated herein by reference.

189.   The False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h), provides relief for an employee who was discharged or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of efforts to stop one or more violations of the False Claims Act.

190.   Dr. Helmig voiced his reasonable, good faith belief that Defendants were defrauding the federal government by obtaining grant funding, for duplicative and inflated overhead fees, by intentionally mischaracterizing project costs.

191.   By voicing these concerns, Dr. Helmig upset Defendants, who have numerous motivations to maximize funding granted by the federal government.

192.   Defendants retaliated against Dr. Helmig by impeding his ability to perform his research, conducting a sham investigation of nonexistent "misconduct," publicly disparaging Dr. Helmig's reputation, and terminating his employment.

193.   As a direct result of Defendants' conduct and actions, Dr. Helmig has suffered and continues to suffer damages.

## JURY DEMAND

Dr. Helmig seeks a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

THEREFORE, Dr. Helmig Respectfully prays for a Judgment in his favor for:

A. Economic damages for breach of contract, reputational harm, and loss of reputational enhancement;

B. Non-economic damages for reputational harm, loss of reputational enhancement, inconvenience, mental anguish, and emotional distress;

C. Exemplary damages;

D. Compensatory damages under the False Claims Act;

E. Special damages;

F. Nominal damages;

G. Declaratory and/or injunctive relief;

H. Backpay;

I. Reinstatement with seniority, or front pay in lieu thereof;

J. Attorney's fees and costs;

K. Pre- and post-judgment interest;

L. Any further relief the Court deems just and proper.

Respectfully submitted this 6th day of April 2022.

JESTER GIBSON & MOORE, LLP


_____s/ Brian T. Moore_____
Brian T. Moore
Rachel I. Tumin
1999 Broadway, Suite 3225
Denver, CO  80202
(303) 377-7888
ATTORNEYS FOR PLAINTIFF