IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 22-cv-836-RM-MEH

---

DETLEV HELMIG,

Plaintiff,

vs.

BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO, et al.,

Defendants.

---

Proceedings before MICHAEL E. HEGARTY, United States Magistrate Judge, United States District Court for the District of Colorado, commencing at 1:23 p.m., February 14, 2023, in the United States Courthouse, Denver, Colorado.

---

WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

---

APPEARANCES

BRIAN MOORE, Attorney at Law, appearing for the Plaintiff.

HERMINE KALLMAN, Attorney at Law, appearing for the Defendants.

---

STATUS CONFERENCE

P R O C E E D I N G S

(Whereupon, the within electronically recorded proceedings are herein transcribed, pursuant to order of counsel.)

COURTROOM DEPUTY: All rise. Court is now in session.

THE COURT: Please be seated. 22-cv-836, Helmig vs. Board of Regents. Make your appearances, please.

MR. MOORE: Good afternoon, Your Honor. Brian Moore appearing on behalf of plaintiff, Detlev Helmig.

THE COURT: Thank you.

MS. KALLMAN: Good afternoon, Your Honor. Hermine Kallman on behalf of all defendants except the Estate of Draper, which I believe has been dismissed anyway.

THE COURT: Thank you. All right. Oral argument on a motion to dismiss. So your burden.

MS. KALLMAN: Thank you, Your Honor.

As Your Honor might remember at the scheduling conference, we had a little bit of discussion that Plaintiff here was a former research professor, research associate professor at the CU Boulder, sued too many individuals, and frankly, for reasons we're not entirely clear.

And the motions to dismiss are primarily addressing those issues, that the number of individuals basically do not have any notice of what they're being

accused of other than simply doing their job.

I'll take the regent defendants as we did initially in our motions to dismiss first and then address the remaining individuals.

THE COURT: Or we could have a little bit of discussion right up front.

MS. KALLMAN: Sure.

THE COURT: First of all, it is very common in this context to, in my view, want to go after everybody, when you really only need to go after one or two at most to achieve all the relief you could regardless. So I suspect in most 1983 cases, and maybe this one included, that if individuals were found responsible, the entity pays; is that correct?

MS. KALLMAN: Yes, Your Honor, that's correct, unless something egregious or willful and wanton or outrageous happens, which doesn't really happen.

THE COURT: Unless you made an actual finding that somebody had violated the law or somehow they clearly violated their own organization's policies --

MS. KALLMAN: Right, and scope of their employment.

THE COURT: -- and scope of their employment. And yet you -- there's no such inclination here, I suspect?

MS. KALLMAN: That's correct, Your Honor.

THE COURT: Right. So, I guess, can I pose to you why? Why not just keep the circle tight?

MR. MOORE: Well, Your Honor, one reason to be, I guess, entirely frank about is it is also common in this context for the defendant to move to dismiss any and all defendants who have been named. The legal standards are somewhat challenging, and we would feel we have done our client a great disservice if we voluntarily withdrew two-thirds of the defendants and Your Honor were to determine that the other third are the ones we should have withdrawn and they were dismissed on the defendants' motion.

So would we be happy to have a conversation with defendants to stipulate as to certain defendants going forward? Absolutely. Are we very inclined to voluntarily withdraw some as to whom we think we can state a claim when the defendants are going to move to dismiss the ones we retain anyways? That's a much more difficult proposition.

THE COURT: So, Ms. Kallman, with the prediction, not necessarily, you know, 100 percent, that there may be a fact issue with regard to disposing of the whole case, would you be able to engage in that conversation?

MS. KALLMAN: Absolutely, Your Honor. And, frankly, I thought we had. And, initially, the amended -- the first complaint did name even more individuals, and we engaged in that conversation. And we always stipulate, and

did in this case as well, that if discovery shows for any reason that any of the dismissed individuals somehow should have not been dismissed, we're not going to play games and assert statute of limitations, but we will certainly consent to an amendment.

But, ultimately, as your Court notes, we did offer, actually, that for 1983 prospective injunctive relief claims, Chancellor Distefano is the proper defendant, and Plaintiff added him as the proper defendant, as it should.

THE COURT: In official capacity?

MS. KALLMAN: In official capacity, that's correct.

THE COURT: That's all you need. You need one official capacity person for an injunctive claim.

MS. KALLMAN: Yes. And 1983 against the university, as Your Honor is well aware, it does not stand because of the university is not a person under 1983, as well as the 11th Amendment immunity. But Chancellor Distefano in his official capacity can certainly afford all the injunctive prospective relief.

And there is also -- for damages claims, there is state law claims, breach of contract and promissory estoppel, which we agreed to allow to proceed in this case so that in federal court and not assert the 11th Amendment immunity, not to bifurcate and have state and federal

proceedings going forward.

THE COURT: Well, so is -- promissory estoppel wouldn't be a tort, would it?

MS. KALLMAN: No. It's a contract, the implied contract theory.

THE COURT: So there's no tort claim that's pending?

MS. KALLMAN: No. And Board of Regents would be the proper defendant. So I guess my point is that between the Board of Regents and Chancellor Distefano, we believe the right defendants would be those two, and the individuals basically do not need to be here.

THE COURT: So is it -- is it agreed that he was -- that the position was research associate professor?

MR. MOORE: Yes, Your Honor.

THE COURT: Okay. And what was his salary?

MS. KALLMAN: Something like 185,000, I believe, Your Honor, give or take a little bit.

THE COURT: Right.

MR. MOORE: All of it, I do not recall.

MS. KALLMAN: Yeah, I think that's about right.

THE COURT: So I don't mind doing my job, and in fact, I have an order drafted. It's just -- it's so much better from a judge's perspective when reasonable minds can get together and agree that these are really the people that

should be named. And I've even been sued once, I guess, maybe, as a federal judge, and, you know, there's absolute immunity, so there's never any doubt about that. Even as an assistant U.S. attorney, they have absolute immunity in many circumstances. It still is a bummer to be a defendant in a lawsuit, it really is.

MS. KALLMAN: Well, you have to disclose it if you're applying for a loan, et cetera.

THE COURT: 100 percent. And then there's other questions that arise. Lots of the public don't understand that simply being named in a lawsuit doesn't mean anything, because it really only takes walking into a building, plopping the paper down, and having it stand. So that just creates problems for regular people who are just trying to do their job. But sometimes there are actual civil rights that are violated. We're here to hear those cases. We do all the time.

But I do really believe that it's important at the beginning of a case to narrow in, especially for a plaintiff, on the strongest case against the least number of people for which you can achieve total relief. That's the key to me.

So, you know -- and, frankly, if you go further, there are potential consequences of over-pleading, you know. A reapportionment of costs and fees that I'm not afraid to

do for multiplying proceedings unnecessarily.

So how would you like to proceed at this very moment? I mean, we can have our lawyer argument, which is fine. You know, I suspect there may be a fact issue that might prevent total dismissal. If you guys want to try to talk even right now. I know you have to have permission of your client, but you could come up with a plan to present to me and then to your client.

How would you like to proceed?

MS. KALLMAN: We're always open to discussion, Your Honor. I mean, assuming Counsel and Plaintiff are amenable.

THE COURT: Well, we can even take a recess right now, if you'd like.

MR. MOORE: Happy to have that conversation, Your Honor.

THE COURT: Okay, why don't we do that, okay? And I'm on standby at your beck and call. How often does a judge tell you that, okay? So we'll be in temporary recess. All right?

MS. KALLMAN: Thank you, Your.

COURTROOM DEPUTY: All rise.

(Recess taken from 1:32 p.m. to 2:05 p.m.)

COURTROOM DEPUTY: All rise. Court is now in session.

THE COURT: Please be seated. Okay, how are we proceeding, please?

MR. MOORE: Do you want me to go?

MS. KALLMAN: Sure.

MR. MOORE: Your Honor, we were discussing in particular the issue that you were focused on, the number and identity of defendants identified and the defendants' argument there weren't adequate personal allegations as to various of them. And we think we could get to a stipulation on certain terms as to that issue, but it became clear during the discussion that that was the only issue that would be stipulated to. And one party or the other, not surprisingly mostly the defendants, since it's their motion, want all the other issues resolved anyways. So we're not sure if it would do much at this stage to make that stipulation or if it might make more sense to wait until after your ruling to try to reach that agreement.

THE COURT: Well, I mean, yeah, after my ruling, it may be moot.

MR. MOORE: Understood.

THE COURT: Because, you know, I have an obligation not to have anybody in the case that has not been properly pleaded against in stating a claim. And it's just hard to believe that a Board of Regents would be that involved with a research associate professor. It's

possible, but how many of these people have never heard of this person?

MS. KALLMAN: I think they were, Your Honor, briefed at some point that he was terminated, especially because there were media inquiries about him, but --

THE COURT: That he was terminated, so retrospectively, but prospectively --

MS. KALLMAN: Right.

THE COURT: -- how many would have known?

MS. KALLMAN: I'm not sure any, other than they may have been generally aware of his research, because he's a well-known researcher.

THE COURT: Okay. In what -- okay, that's fine. Well, all I can do is try it. So go ahead.

MS. KALLMAN: So we're going to be arguing the motions?

THE COURT: I think we have to.

MS. KALLMAN: Your Honor, for regent defendants, the first argument is that the claims as stated are barred by statute of limitations. And the main argument really here before the Court is not that they were timely pleaded, but whether the relation back doctrine applies. And -- because initially in April, which was a timely filed complaint, was filed just one day before the two-year statute of limitations expired on the 1983 claims, only the

Board of Regents, a body corporate was mentioned -- was named a defendant, and individual regents were not.

And in the amended complaint that came at the end of June -- towards the end of June, I believe -- I have it right here, June 24th -- the individuals were added, and we have moved to dismiss based on expiration of statute of limitations, and believe the relation back doctrine doesn't apply because there was nothing in the first complaint that would have given notice to the individual regents that they should be somehow individually named. And certainly there was -- and they were not named because of some kind of mistake as to their identity, which is required under Rule 15(c) before relation back doctrine would apply.

THE COURT: Okay.

MS. KALLMAN: We have moved also to dismiss the individual regents on the basis that -- and this is something we discussed with counsel, is whether there is no allegations as to what each specific individual regent did with respect to property interest, deprivation, or the liberty interest deprivation.

And to emphasize that point, we can just take one person, let's say Regent Spiegel, who did not become a regent until January 2021. And to put her into a group of all the regents together making public statements about Dr. Helmig, about his termination back in 2020, April 2020, or

May 2020, it just emphasizes the point that she should not belong in that group.

THE COURT: You said Ms. Spiegel?

MS. KALLMAN: Yes.

THE COURT: Hard to argue that one. I come onto the board and something happened a year ago I'm personally responsible for?

MR. MOORE: Your Honor, by way of context, the second report, which is one we are heavily focused on in this case, did not come out until April or May of 2021, so after she was on the board. However, I do believe that the specific communications from the board itself that are referred to in the complaint pre-date her. We did not realize that she did not join until January, so I do believe it would be appropriate to dismiss her.

THE COURT: You can ignore that.

MR. MOORE: Based on the representation that --

THE COURT: Thank you so much.

MS. KALLMAN: And finally, we move to dismiss based on, again, lack of individual participation in deprivation of the property interest, for the same reasons. While the regents are the ultimate appointing authority, they delegate that power, there is no dispute about that, that the individual supervisors and the persons who terminated Dr. Helmig, who are also named defendants, and

therefore, the regents do not belong -- they are not the proper defendants, since there is nothing alleged that they have done wrong.

I understand the plaintiff's position is that because they had that authority, they were required to somehow intervene in his termination, but there is no allegation that they were even aware, as Your Honor noted, that he was being terminated until after the fact.

THE COURT: And are there any cases supporting a failure to intervene theory that you're aware of?

MS. KALLMAN: Not that I could find, Your Honor. I looked for supervisor liability, and again, they either have to promulgate rules to allow this kind of deprivation to happen, which the plaintiff's position is exactly the opposite, that the rules did not allow it to happen. And nothing that shows that even being aware of, especially in this case, after the fact, would rise to such liability.

That's as far as the regent individual defendants. For the non-regent defendants, so --

THE COURT: So what are -- let's look at the specific allegations against the regents. So let's pull up a well-known name. Heidi Gagnon, right? She ran for --

MS. KALLMAN: Governor.

THE COURT: Governor. You can't research these -- you can't search in this -- so she's mentioned in the

caption. She says that the plaintiff alleges that she at all times held the office of regent, all relevant times; that they were aware of -- would routinely fulfill their statutory duties to hire and fire faculty. They oversaw, contributed to or ratified the investigation report. A little bit of a vague allegation. And that's it. Those are the only fact allegations, I think.

So it's more of an oversaw, adopted and ratified termination; is that fair?

MR. MOORE: As to the property interest claim, yes, Your Honor, with a caveat that the regent's own laws play solely upon the regents the duty to and the authority to terminate a term faculty member and by their own laws were supposed to have given that faculty member an opportunity to be heard before termination; that they were promptly after the termination informed of it and were asked for an opportunity to be heard and chose to proceed a different direction.

There are additional allegations on the (indiscernible) liberty interest claim, but I understand correctly we're only discussing property --

THE COURT: So is there a recognized liberty interest under the Constitution with regard to professional reputation?

MS. KALLMAN: When it's -- only when it is in

relation to or in connection with termination of public employment. So not just kind of what you would call a -- you can't just take a -- state a defamation claim and turn it into a 1983, but there is this small exception that the courts have recognized when allegedly defamatory statements are made in connection with termination of public employment.

Moving forward, Your Honor, to non-regent defendants. Is that okay?

THE COURT: Yes, please.

MS. KALLMAN: The crux of the argument, as far as the property interest, which is the same argument as for the breach of contract claims, the promissory estoppel claim, is that there was no protected property interest in employment because there was -- because Dr. Helmig was at will.

Now here, both parties are relying on various policies, campus policies, that Dr. Helmig's appointment letter is not before the Court or any other contract.

The university has moved to dismiss because Regent Policy 5L, which was in force at the time of termination back in April 2020, stated that all research faculty, such as Dr. Helmig, were at will. And then under Colorado law, at-will employment does not give rise to a contract right or a protected property interest under 1983.

Plaintiff has pointed to a departmental policy, a

policy that appears on the website of the Office of Research and Innovation, that talks about research faculty, research professors, specifically assistant associate professors, being appointed for three- or five-year term contracts. These appointments did not automatically renew, but could be renewed, and argues that because he was limited -- under that policy, he was on limited appointment. He was not at will, and thus, was entitled to pre-termination proceedings under regent policies in effect at the time.

We do not argue that limited appointments were subject to pre-termination proceedings under regent policy at the time, but we're saying that the regent policy that says all research faculty is at will supersedes any conflicting departmental policy language to the contrary.

THE COURT: Okay.

MS. KALLMAN: So that's -- that's basically the motion to dismiss as to all defendants really is based on this lack of protected property interest.

That leads us to the liberty interest, the second claim for relief. And here, our argument again is that you have to have -- each defendant has to be alleged to have individually made public statements that were defamatory or harming -- harmful to the reputation of the plaintiff, and without an opportunity for him to be heard. This is again a due process claim, which means really the idea is was he

afforded the opportunity to clear his name.

And the bulk of our arguments is that not enough allegations have been made to show that individual non-regent defendants or regent defendants have made such public statements. And we have grouped them, you know --

THE COURT: Where are the amended complaint of public statements identified?

MS. KALLMAN: So Melanie Parra was the spokesperson. I'll get there real quick. And the public statements -- the only public statements will contend that when made, were made by her. That would be paragraphs 120 to 124, for example.

THE COURT: So an ethics -- in essence, an ethics violation. It doesn't maintain the required degree of daylight between publicly funded research efforts and his own for-profit business. That's sort of an ethics issue, isn't it?

MS. KALLMAN: It was a specific university policy beyond just ethics. There were certain policies requiring that the research faculty -- it's actually a fiscal policy violation as well, because if university resources are used for any projects that benefit not the university, but the individual enterprise, then that was the problem in this case. Or at least there was the concern that the resources were intermingled in a way that was not appropriate under

the policies.

THE COURT: So there's two statements: Paragraph 120 and 121. Is that correct?

MS. KALLMAN: Yes, Your Honor. Sorry.

THE COURT: Okay. Please proceed.

MS. KALLMAN: And we don't -- we don't disagree that Ms. Parra made those statements as the university spokesperson when she received media inquiries, but under McDonald v. Wise, our argument is that she was -- she was not a person who was in a position to provide a name-clearing hearing. She was a spokesperson. And it's pretty much identical in the situation in McDonald v. Wise, where the Court held -- Tenth Circuit held that the spokesperson who was simply repeating what basically university told her to say was not in a -- had qualified immunity to a liberty -- deprivation of liberty interest claim.

THE COURT: So the requirements are the statement impugns a good name?

MS. KALLMAN: Yes.

THE COURT: It's false, it's made during the course of a termination, like you said, and it's published. And then anybody -- so what's a zone of people who could be liable beyond the person who actually makes the statement?

MS. KALLMAN: Those who cause the statement to be

made and are in a position to provide a name-clearing hearing, but don't.

THE COURT: Okay.

MS. KALLMAN: That's our understanding of McDonald v. Wise.

THE COURT: All right. And who -- are you proffering who did cause that statement to be made?

MS. KALLMAN: Your Honor, we believe Chancellor Distefano is the ultimate authority on campus, is the proper defendant as to all 1983 claims.

Now, the issue is that there may not be damages -- well, there are no damages available against him in his individual capacity -- or in his official capacity, but that doesn't necessarily -- just because the monetary damages are not available as a relief to Plaintiff doesn't mean that they must come from someone who was not in that position.

THE COURT: Okay.

MS. KALLMAN: The internal audit person -- so we grouped the defendants -- Chapman, Smith, and Thompson were employees of the university's internal audit, and that department is alleged to have done a report that Dr. Helmig believes was defamatory.

Now, the report was eventually released to the public, but it wasn't released by any of these individuals. At least that's not what's been alleged in a complaint.

They did their job. They did a complaint. They did this audit and issued a report. It's an internal audit report.

We have moved to dismiss those individuals because there are no allegations that they made any public statements.

Same thing with Gregory Brown -- Defendant Gregory Brown and Chrystal Pochay and Dr. Fiez, who was the head of the Office of Research and Innovation. They are also not alleged. And I believe the plaintiff agrees that Dr. Fiez for sure did not make any public statements that would impugn his good name or reputation.

That really leaves two individuals: Gifford Miller and Merritt Turetsky, who were his supervisors. Gifford Miller was a colleague but had been a supervisor in the past, and Dr. Turetsky was the supervisor at the time of the termination.

THE COURT: And Turetsky would be the deciding official? Or the recommending official?

MS. KALLMAN: To terminate? She would be the deciding -- she has the delegation authority. Even though Vice Chancellor Fiez also signed the termination letter, the chair of the institute, Merritt Turetsky, had the authority to terminate.

THE COURT: Okay.

MS. KALLMAN: As far as the liberty interest, it

is alleged that she and Dr. Gifford Miller made statements to the NSF, to the National Science Foundation, regarding Dr. Helmig's contract -- employment in connection with his grants that he received from National Science Foundation.

We have moved to dismiss on the basis that that's akin to intra-governmental communication and it's not a public statement.

Plaintiff has argued that intra-governmental communication does not extend to communications between, in this case, state and federal government. We have cited a Tenth Circuit law that says that issue is unsettled and a Fourth Circuit court has found that there is no material difference between intra-federal agencies or intra-state agencies and between state and federal or, in that case, they also involved tribal agencies. I believe that case involved security or putting persons on anti-terrorist watch lists.

And at the minimum, we submit that the law is unsettled. It's not clearly established constitutional right. And for that reason, Drs. Turetsky and Miller enjoy qualified immunity.

THE COURT: Okay. Thank you.

MS. KALLMAN: Thank you.

THE COURT: So just -- I mean, I guess one thing before I forget. You understand how things work around

here? This is going to be a recommendation. Everybody gets another chance to brief it and then it sits for 6 to 12 months. You understand that, right?

MR. MOORE: I do understand that, Your Honor.

THE COURT: So to avoid the process might be in your best interest, but we're here.

MR. MOORE: My understanding is the defendants want Your Honor to resolve most of the issues raised in the motion, so there's no way around proceeding regardless.

THE COURT: Okay.

MR. MOORE: I appreciate the thought. And I also declare, certainly, appreciate that defendants have the right to have these issues resolved and I wasn't meaning to --

THE COURT: Sure. No, I didn't --

MR. MOORE: -- cast aspersions.

THE COURT: -- take anything different from that.

MR. MOORE: Thank you, Your Honor. And I'm going to start at a slightly different place, which is at the merits of the property interest claim.

Dr. Helmig in his complaint relies on two documents as giving him a property interest in continued employment. The first is the laws of the regents of CU, and the laws are the highest authority within the CU system. And as we discuss in our response, those laws expressly

state that any term faculty member, meaning a faculty member who has an appointment for a defined period of time, may only be terminated by the regents for cause -- cause being very narrowly defined -- and only after being given an opportunity to be heard, not just in some generic sense, but in a very specified procedural sense that's laid out in the laws and in the underlying policy documents. So that's -- that's the first source.

And the second is not a departmental policy, but a campus-wide policy at the University of Colorado Boulder, which has been in existence at least since 2012 -- that's the earliest version we know of. It may well have existed even before then -- which expressly states that all faculty in the research professor line, including specifically associate professors, have term appointments for a specified number of years.

Initially, in Dr. Helmig's career there, it was a three-year appointment. Later, it was amended to become a five-year appointment.

Under Sabrian (ph), those documents unequivocally established that he had a right to a term of employment.

THE COURT: So would his damages be limited to the rest of the term?

MR. MOORE: Arguably.

THE COURT: His, at least, economic damages?

MR. MOORE: Economic damages, yes, on the property interest claim specifically.

THE COURT: And how much time specifically would that be in this case?

MR. MOORE: That is probably going to be open to debate, Your Honor, because at least from documents we have pre-discovery, we don't know how the switch was handled when it went from three years to five years. Was that supposed to apply to existing appointments, only future appointments, et cetera? So we haven't -- we're not intending to take a position on that until we've gotten discovery to know what other documents are out there.

THE COURT: Okay.

MR. MOORE: CU tries to avoid the obvious effect of those documents by relying initially on two other policy documents which are contained not in the regent laws -- CU has many levels and layers of policy documents -- but in an entirely different layer of documents. It has since withdrawn its argument based on one of those, given that the correct version actually lends support to Dr. Helmig's claim, and relies now only on Regent Policy 5L.

And we respectfully suggest that document does not change the outcome whatsoever, certainly not at this stage. It will be subject to argument again on summary judgment, I'm sure, but for a couple of reasons. One is that it

shouldn't be considered at this stage. You know, we don't concede the accuracy of it. They presented two documents initially. One proved to be inaccurate. We have no reason to say that one they're still relying on is inaccurate, but the point is Dr. Helmig has no way of knowing.

And that's why in our response we asked the Court to join, I think it was the Second Circuit, which has expressly held that materials not in the possession of the non-moving party should not be considered on a motion to dismiss because that party has no way of knowing if they're authentic or not.

But even if it is considered, it only creates a conflict within the labyrinth of policies that CU maintains and the essence of the Sabrian (ph) decision is that a public employee presented with a policy adopted by the public entity telling them they have a term of employment have a right to rely on that policy.

Nothing in Sabrian suggests the agency can avoid that by having some of its own internal conflicting documents. And in fact, in Sabrian, there was a conflicting document presented directly to the plaintiff and the Court still held the plaintiff could rely on the established policy. And so for that reason, the third and fourth claims should not be dismissed.

Turning to the protectable property interest, even

if for any reason Your Honor were to disagree with what I just said and conclude that, no, 5L defeats a contract claim, still Dr. Helmig would have a protectable property interest in continued employment for purposes of Section 1983.

The reason is that that property interest attaches to, quote, a legitimate expectation of continued employment, which does not require something that is enforceable at contract. In the McDonald v. Wise case, the Tenth Circuit gave as examples of what would give rise to that: Either a contract for a fixed term or -- and it used the word "or" -- if state law allows dismissals only for cause or its equivalent.

So if CU is correct that, as a matter of law, 5L somehow defeats the right that Dr. Helmig had only to be terminated for cause, that would mean he can't invoke the last of those prongs, or if state law allows dismissal only for cause, but he still had a contract for a fixed term.

I always get the grammar a little confused here, but I think the disjunctive is the word, that's listed in the disjunctive, anyone will suffice, and it's undisputed he had a contract for a term under that policy.

And then in -- and that decision in McDonald v. Wise was based on Supreme Court precedent, where the Supreme Court has written that college professors and staff members

dismissed during the terms of their contracts have interest in continued employment that are safeguarded by due process. That was the Board of Regents v. State -- Board of Regents of State Colleges v. Roth decision back from 1972.

So -- and the only grounds the defendants have argued for dismissal of the non-regent defendants on the property interest claim is that Dr. Helmig had no protectable property interest. So for current purposes, assuming Your Honor agrees that he had at least possibly -- this is a motion to dismiss -- a protectable property interest, then none of the individual defendants, setting aside for a moment the regents, should be dismissed as to that claim of those, because no other argument has been raised that they should be dismissed.

THE COURT: Well, it's hard to imagine that nine different people are responsible for the deprivation of the property interest, if one exists, given the fact that the decision was not made in all likelihood by nine people.

MR. MOORE: The decision clearly -- well, again, we have limited information; this is pre-discovery. But what we have clearly indicates the decision was made by three individuals directly, and those are Ms. Fiez, Mr. Miller, and Mr. Turetsky. Two of them signed the termination letter itself. And understand that research faculty in the CU system hold dual appointments. They have

an appointment at a research institute, which is Instar in this case, and they have an appointment at an academic department. And so there are two appointing authorities, and so there are two terminating authorities in the first instance.

And then the third of those individuals was the associate director of Instar, who directly participated in the termination meeting and terminated Dr. Helmig. So we believe all three of those individuals, at least based on the evidence at hand, clearly do have direct participatory responsibility.

THE COURT: And the other six are just failure to intervene?

MR. MOORE: The others -- well, there's -- again, setting aside the regents, I don't think we named all of the other individuals on this claim. We named four --

THE COURT: Okay.

MR. MOORE: -- five other individuals in this claim and they're not failure to intervene. They are the ones who brought about, if you will, Dr. Helmig's termination. Ms. Pochay being the one who we allege -- Dr. Helmig alleges for retaliatory reasons made bad faith allegations for the specific purpose of bringing about his termination, and then the internal audit individuals who without conducting a good faith investigation authored the

report that was relied upon for giving the termination. But they are the three who are the directly responsible individuals.

THE COURT: Okay.

MR. MOORE: Turning then to -- unless Your Honor has any other questions on that?

THE COURT: No, no questions.

MR. MOORE: Turning then to the statute of limitations issue, the Board of Regents. This case is exactly the case for relation back. If Your Honor takes a look at the 1966 -- the Rules Committee comments to the 1966 amendments to Rule 15(c), they expressly identify as the primary driver of the amendment that allows the current form of relation back as misidentifying a government defendant. Specifically, the example they give is a plaintiff who identifies the Department of -- I'm going to get the name wrong -- Health and Human Services, something of that sort, the federal department. By law, they are supposed to name the secretary of that department, but plaintiffs would often name the department itself, and the Rules Committee gave that as the leading example of what relation back was intended to be allowed by the amended Rule 15(c), and that is exactly what we're dealing with here.

The original complaint named the entity, if you will, the Board of Regents, which is simply the composite,

the collection of the individual regents, and CU, and we acknowledge correctly, pointed out, no, you have to name the individual regents, and so we amended to name the individual regents. That is a clear case of relation back correlation.

And then, frankly, I don't think any further analysis is necessary because it is so squarely within the rules as explained by the comments; but if you do dive into the details, you know, the main thing that's required for relation back in this context is timely notice, meaning timely within the time allowed for service of the complaint.

The very day that the complaint, the original complaint was served, my office emailed it to the Office of University Counsel, which is, of course, the office legally charged with representing the regents when they are sued. Within days, well within the time period, they responded that they were authorized to waive service on behalf of the Board of Regents, but raised the issue of proper defendants and the ensuing conferral.

So they were well aware of both the fact that the complaint was served and of their own belief, which we acknowledge is correct, that the wrong defendant was named, and it should have been the individual regents. So I think the statute of limitations argument is, frankly, a non-issue.

With respect to the regents, then, the individual

regents and the property interest claim, I've already spoken about that a little bit on your questioning. It is based on a failure to perform their legal duty theory.

What's required by the case law is an affirmative link between the individual defendant and the constitutional deprivation. One of the cases we discussed in the brief is -- sorry, I'm drawing a blank. It was a sheriff in New Mexico. I think it was Stevenson was the case, but where the sheriff -- you know, the deprivation of issue was detainees not being allowed to post bail when they shouldn't be released. And the sheriff was named as a defendant and said, I had nothing to do with this individual plaintiff. I didn't deny him. I didn't refuse to accept his bail, et cetera, et cetera.

And what the Court focused on is that -- and I misspoke, it was an Oklahoma case. What the Court focused on was that Oklahoma law specifically charged sheriffs with authority to set the policy and govern these operations in jails, and therefore, the sheriff was responsible for failing to perform his duty in allowing this impermissible practice to continue.

And the theory is the same of the regents here, both by Colorado state statute and by their own regent laws: This was their job. It was their job to decide whether Dr. Helmig should be terminated during the term of his

employment. It was their job to make sure, ultimately -- I mean, there was, under the procedures, there were lower levels that should have happened. But ultimately, it was their responsibility to ensure that he had a due process hearing before they elected to terminate. And they failed in those duties, and there was a direct causal link between that failure and his termination without due process.

But it's a straight legal issue. Either that's enough or it's not. It's not a question of the specificity of the factual allegations. We get much more into that with the liberty interest claims, which I'll turn to now.

THE COURT: Okay.

MR. MOORE: And I want to be clear on the liberty interest claims, that there are a number of different publications that we are talking about. There are the publications by the press secretary, Ms. Palla [sic], the multiple statements by her. There are -- Parra, excuse me. There are the statements by the two defendants to the National Sciences Foundation. There is the release to the media directly of the second report in its entirety, which contains a plethora of the disparaging statements. And there were statements by individual members of the Board of Regents to members of the public, which, in our view, legally affirmed and ratified the other statements.

And I'll start there with the regents, since Your

Honor has focused on it a bit.

The -- at least the author of most of those communications was Glan Gallegos, who was the chair of the Board of Regents at the time. And I apologize. My recollection is that there was at least one other by one of the other regents in my -- it occurred to me at the last minute I should confirm that, and I failed in the time I had, and so I'm not positive there was a second author.

Mr. Gallegos was the chair of the Board of Regents, as I mentioned, so our theory, our assumption, frankly, the minutes we got through CORA of meetings, relevant meetings, are redacted. It's clear the Board did discuss -- Dr. Helmig did discuss his termination shortly after it and discussed the response to it. Our assumption is that the Board of Regents decided as a group that Mr. Gallegos, as their chair, would send these communications responding to various members of the public who inquired. To be honest, we don't know that. We are hoping to confirm that in discovery.

At the very least, clearly the claim should go forward as to Mr. Gallegos, who personally made those communications. And if there is any -- if Your Honor concludes there's any deficiency in the pleading for failing to specifically list out the individual communications or anything of that sort, our request would be that dismissal

be without prejudice so that we could cure that technical pleading defect by amendment.

So that is primarily where the claim comes from against the regents on the due process claim.

The second component of this is, as made clear in the amended complaint and the original complaint, for that matter, our understanding, and Dr. Helmig's allegation and theory is this: When he was terminated, there was a degree of public outcry. The trustees, the administration received a number of inquiries from individuals, from advocacy groups, questioning and criticizing them for the termination.

Our theory is that the Board of Regents, presumably in discussion with senior administration officials, made a decision not to reconsider the decision, not to give Dr. Helmig the hearing he was entitled to and should have been given before the termination, but instead to commission this second report for the specific purpose of making it public and trying to blunt or mitigate this public criticism they were receiving.

There's been no attribution. The university has not identified who prompted, who requested, who initiated the second report. So this is our theory at this point that we hope to establish through discovery or possibly find out that some other person is the proper defendant on that.

But given the theory that the regents made a decision not to give Dr. Helmig a due process hearing, a name-clearing hearing, but instead to commission a report specifically for the purpose of creating a public document to use to justify his termination, and that the product of that process was a document that contained several demonstrable falsehoods impugning Dr. Helmig's good name, that they do have an affirmative link with his due process liberty interest violation and that they all are property defendants on that claim at this stage.

Again, if the evidence shows that our theory is wrong and they did not make that determination and someone else drove that process, we'll dismiss them at that point, except for Mr. Gallegos, who authored those letters.

Regarding the other defendants on the liberty interest claim -- and I would like to make clear that there's been no assertion by the university that the public statements that were made were not disparaging enough to satisfy this element. We're talking solely about which individuals have sufficient personal responsibility, if you will, for the making of those communications.

With respect to Ms. Parra, the press secretary, look, I understand what Your Honor is almost certainly going to feel obliged to do, given the Tenth Circuit precedent, the single sentence, I think it is, a Tenth Circuit sentence

that the university has cited. We wish to preserve that issue for appeal, to be frank, and so that is why we have not withdrawn her from the case.

Regarding the other defendants, again, the theory is that this second report was prepared from the outset, not as a good faith investigation, but as a cover. We're getting a lot of flack. We want a document we can give the public that will hopefully convince them this was a legitimate decision. Give us that document.

And the theory is that these other individuals who I think it is clear, most of them at least, we think all of them participated in the preparation of that document, did so as part of a conscious effort to prepare a document for public dissemination.

And to be clear, the emails and letters from Chair Gallegos back, I think it was in May of 2020, a month after the termination, specifically referred to the fact that this report would be prepared and that he was confident it would show that the termination -- the reasons for termination were valid.

And so that's when I say our theory is that the report was prepared for that very purpose, we have a basis for it. We're not just making it up. But that is why we believe these individuals who participated in the preparation of that report are proper defendants, at least

at this stage, because we believe, we allege, they prepared that document for the purpose of disseminating it publicly, which establishes the causal connection between what they did personally and the making of the public statement.

Oh, and finally, as to the -- I had a feeling I was skipping something. As to communication of the NSF, which was specifically by Defendants Miller and Turetsky, it is clear that a public official violates an individual's constitutionally protected rights when they falsely disparage him in a publication in connection with his termination.

The Tenth Circuit has recognized an exception for intra-governmental communications. Only for intra-governmental. It has not, it is true, expressly said that an intra-governmental communication is not an intra-governmental communication, but that's not the standard. The right is clear, the only exception which has been recognized in this jurisdiction that's conceivably relevant here is not relevant here.

And I would urge Your Honor to read Judge Mix's -- I think it was Judge Mix's decision in the Al Turki v. Tomsic case, where she discussed the Tenth Circuit precedent that existed on intra-governmental communications and expressed the view, and we think correctly, that the wording of those opinions itself, even though not holding that the

exception doesn't apply to intra-governmental communications, implies it, that that's sort of assumed in the language used by the Tenth Circuit in its precedence.

The only case cited by the defendants to the contrary is a Fourth Circuit case, which in a couple sentences at the end of discussing the intra-governmental exception says -- and the same thing applies intra-governmentally with no cites and has not been cited by any court since.

As counsel indicated, the context of that case was the placing of an individual on a, like a terrorism watch list. Judge Brooke Jackson of this district has reached the opposite conclusion in the same context, and that's the Coker v. Barr case reported at 2020 Westlaw 9812034.

So we don't think that legally there is any exception for intra-governmental publication. A publication from the state of Colorado to the United States government is a publication for purposes of 1983, and particularly when it's a publication to the agency which was responsible for funding most of Dr. Helmig's research, it certainly is a publication of the magnitude that can cause a constitutionally cognizable injury.

THE COURT: Thank you. You need to wrap up? You don't have to.

MS. KALLMAN: Just a couple of points, Your Honor.

THE COURT: Okay, go ahead.

MS. KALLMAN: I think there may have been a confusion.

As far as the regents individually named as defendants, I'm sorry if I misunderstood or misheard counsel, but I think there was an argument made that we reached out and said Board of Regents is not the proper defendant or the individual regents should be named, and that's absolutely not correct.

As Your Honor is, I'm sure well aware, Board of Regents is a body corporate. It's not just a collection of individuals, it's an actual separate legal entity. And it gets sued all the time. That is the proper entity to be sued when University of Colorado is a defendant.

THE COURT: Well, they're a defendant here still, right?

MS. KALLMAN: Yes, and they are, exactly. And just the fact that the body corporate, the legal entity, is being named in a lawsuit, we submit, does not give notice that regents individually and personally may be liable for damages for any claims. Just wanted to kind of make sure that was clear.

THE COURT: That's a fairly strong argument, that just because my agency is sued and may be exposed to liability, that never means that I am, personally.

MS. KALLMAN: Right. And I understand the argument about the Health and Human Services case, but that's different, because the secretary, I believe in that case, is designated by law to be the correct entity to be sued.

THE COURT: Right.

MS. KALLMAN: For us, it's the correct entity, it's the Board of Regents, not the individual.

THE COURT: Well, and also, I think the secretary in their official capacity, not in the individual capacity.

MS. KALLMAN: Not in individual capacity, that's correct.

THE COURT: Not in individual capacity, okay.

MS. KALLMAN: We did reach out and say, to the extent there is any injunctive relief that is being sought under Section 1983, the chancellor in his official capacity as the ultimate executive --

THE COURT: Right

MS. KALLMAN: -- officer on the campus is the proper defendant.

THE COURT: Okay.

MS. KALLMAN: That one issue I wanted to address real quick.

The second one was that I think that counsel said that it is undisputed that he had a contract for five years,

and that is not correct. That is the allegation, even though, as Your Honor asked, it's not alleged when exactly the five-year term started and when it was about to end. So I just wanted to point that out as well.

As far as the rest is, counsel is going at some length about the second report and Regent Gallegos sending emails. None of that is in the complaint.

Thank you.

THE COURT: Thank you. All right, it shouldn't be long. I would say a week or two, I hope. Okay? And then you'll start your journey at the next level.

Anything further?

MR. MOORE: Nothing from the plaintiff. Thank you, Your Honor.

THE COURT: Thank you for today.

MS. KALLMAN: Thank you, Your Honor.

COURTROOM DEPUTY: All rise. Court is now in recess.

(WHEREUPON, the hearing concluded at 2:52 p.m.)

TRANSCRIBER'S CERTIFICATE

I certify that the foregoing is a correct transcript, to the best of my knowledge and belief (pursuant to the quality of the recording) from the record of proceedings in the above-entitled matter.

/s/Dyann Labo September 22, 2025

Signature of Transcriber Date